MATTHEW W. BAUER(MB7354)
CONNELL FOLEY LLP
85 LIVINGSTON AVENUE
ROSELAND, NJ 07068
(973) 535-0500
Attorneys for Plaintiff
Ramada Worldwide Inc.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAMADA WORLDWIDE INC., formerly known as RAMADA FRANCHISE SYSTEMS, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>NORTH BECKLEY MOTEL CORP., a West Virginia Corporation; ROBERT MILAM, an individual; and HAROLD MADISON, an individual,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: <br>Civil Action No. 07-cv-7997<br><br>**COMPLAINT** |

Plaintiff Ramada Worldwide Inc., formerly known as Ramada Franchise Systems,

Inc., by its attorneys, Connell Foley LLP, complaining of defendants North Beckley Motel Corp.,

Robert Milam, and Harold Madison, says:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Ramada Worldwide Inc. ("RWI") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.      Defendant North Beckley Motel Corp. ("North Beckley"), on information and belief, is a corporation organized and existing under the laws of the State of West Virginia, with its principal place of business at 127 Ontario Drive, Mount Hope, West Virginia 25880.

3.      Defendant Robert Milam ("Milam"), on information and belief, is a principal of North Beckley and a citizen of the State of West Virginia, residing at 127 Ontario Drive, Mount Hope, West Virginia 25880.

4.      Defendant Harold Madison ("Madison"), on information and belief, is a principal of North Beckley and a citizen of the State of West Virginia, residing at 127 Ontario Drive, Mount Hope, West Virginia 25880.

5.      The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over the defendants by virtue of, among other things, section 27 of the February 18, 1994 License Agreement by and between

North Beckley and RWI (the "License Agreement"), described in more detail below, pursuant to which North Beckley has consented "to the non-exclusive personal jurisdiction of the New York state courts situated in New York County and the United States District Court for the Southern District of New York."

       8.    Venue is proper in this District pursuant to section 27 of the License Agreement, inasmuch as that provision contains an express waiver by North Beckley of any objection to venue in this District.

### ALLEGATIONS COMMON TO ALL COUNTS

<u>The Ramada Marks</u>

       9.    RWI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

       10.    RWI has the exclusive right to sublicense the use of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Ramada Marks"), as well as the distinctive Ramada® System, which provides hotel services to the public under the Ramada name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

       11.    RWI or its predecessors have continuously used each of the Ramada Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

12.    RWI has given notice to the public of the registration of the Ramada Marks as provided in 15 U.S.C. § 1111.

13.    RWI uses or has used the words "Ramada," "Ramada Plaza Hotel," "Ramada Inn," and "Ramada Limited," among others, as abbreviations of its brand name.

14.    Through its franchise system, RWI markets, promotes, and provides services to its guest lodging franchisees throughout the United States. In order to identify the origin of their guest lodging services, RWI allows its franchisees to utilize the Ramada Marks and to promote the Ramada brand name.

15.    RWI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Ramada Marks as distinctly designating RWI guest lodging services as originating with RWI.

16.    The value of the goodwill developed in the Ramada Marks does not admit of precise monetary calculation, but because RWI is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of RWI's goodwill exceeds hundreds of millions of dollars.

17.    The Ramada Marks are indisputably among the most famous in the United States.

<u>The Agreements Between The Parties</u>

18.    On or about February 18, 1994, RWI entered into the License Agreement with North Beckley for the operation of a 122-room guest lodging facility located at 127 Ontario

- 4 -

Drive, Mount Hope, West Virginia 25880, Site No. 2681 (the "Facility"). A true copy of the License Agreement is attached hereto as Exhibit A.

19. Pursuant to section 6 of the License Agreement, North Beckley was obligated to operate a Ramada® guest lodging facility for a fifteen-year term, during which time North Beckley was permitted to use the Ramada Marks in association with the operation and use of the Facility as part of RWI's franchise system.

20. Pursuant to section 8, section 28(b), and Schedule C of the License Agreement, North Beckley was required to make certain periodic payments to RWI for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees").

21. Pursuant to section 9 of the License Agreement, North Beckley was required to prepare and submit monthly reports to RWI disclosing, among other things, the amount of gross room revenue earned by North Beckley at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to RWI.

22. Pursuant to section 9 of the License Agreement, North Beckley agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and agreed to allow RWI to examine, audit, and make copies of the entries in these books, records, and accounts.

23. Pursuant to section 19(b) of the License Agreement, RWI could terminate the License Agreement, without notice to North Beckley, if North Beckley discontinued operating the Facility as a Ramada guest lodging establishment.

24.     Pursuant to section 20 of the License Agreement, North Beckley agreed that, in the event of a termination of the License Agreement pursuant to section 19(b) , it would pay liquidated damages to RWI in accordance with a formula specified in the License Agreement.

25.     Section 28(f) specifically capped liquidated damages for the Facility at $122,000.

26.     Section 21 of the License Agreement specified North Beckley's obligations in the event of a termination of the License Agreement, including its obligation to immediately cease using all of the Ramada Marks.

27.     Effective as of the date of the License Agreement, Milam and Madison provided RWI with a Guaranty of North Beckley's obligations under the License Agreement ("Guaranty"). A true copy of the Guaranty is attached hereto as Exhibit B.

28.     Pursuant to the terms of the Guaranty, Milam and Madison agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause Licensee to perform, each obligation required of Licensee under the Agreement."

<u>The Defendants' Defaults and Termination</u>

29.     On or about May 19, 2005, North Beckley unilaterally terminated the License Agreement by ceasing to operate the Facility as a Ramada guest lodging facility.

30.     By letter dated July 25, 2005, a true copy of which is attached as Exhibit C, RWI acknowledged North Beckley's termination of the License Agreement and advised

North Beckley that (a) it was to immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as part of the Ramada System, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Ramada, (b) all items bearing the Ramada Marks had to be removed, (c) all signs and any listings in directories and similar guides in which the Facility was identified as a Ramada had to be changed, (d) it was required to pay to RWI as liquidated damages for premature termination the sum of $122,000 as required under the License Agreement, (e) it had to de-identify the Facility within 14 days from the termination date, and (f) demand was made for all outstanding Recurring Fees through the date of termination.

31.    The termination of the License Agreement precluded North Beckley from any further use of the Ramada Marks in or around the Facility.

32.    The termination of the License Agreement precluded North Beckley from any further use of the Ramada Marks to induce the traveling public to use the Facility in any way.

33.    After the termination of the License Agreement, North Beckley continued to use the Ramada Marks to induce the traveling public to rent guest rooms at the Facility.

34.    After the termination of the License Agreement, North Beckley used the Ramada Marks without authorization to rent rooms through, among other things, failure to remove Ramada signage and continuing to identify the Facility as a Ramada guest lodging facility in response to telephone inquiries as to whether or not the Facility is a Ramada.

35.    North Beckley continued to misuse the Ramada Marks despite receiving notification from RWI to cease and desist from the misuse of the Ramada Marks.

## FIRST COUNT

36.    RWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 35 of the Complaint.

37.    Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

38.    North Beckley marketed, promoted, and rented rooms at the Facility through the unauthorized use of the Ramada Marks, and such use caused confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

39.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods [or] services . . . shall be liable in a civil action . . . ."

40.    The acts of North Beckley in marketing, promoting, and renting rooms at the Facility, through and with the Ramada Marks, constitute:

(a)    a false designation of origin;

(b)    a false and misleading description of fact; and

(c)    a false and misleading representation of fact;

that caused confusion, mistake, or deception, as to the affiliation of North Beckley's Facility with RWI, and caused confusion, mistake, or deception, to the effect that RWI sponsors or approves of the guest lodging services that North Beckley provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

41.    North Beckley's use of the Ramada Marks in connection with goods and services at the Facility, after the Ramada Marks became famous, caused    dilution and disparagement of the distinctive quality of the Ramada Marks, and lessened and will continue to lessen the capacity of the Ramada Marks to identify and distinguish the goods and services of RWI, all in violation of Section 43(c) of the Lanham Act.

42.    North Beckley's acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act were malicious, fraudulent, willful, and deliberate.

43.    North Beckley's acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted irreparable harm on RWI.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), RWI demands judgment against North Beckley granting compensatory damages, treble damages, attorneys' fees,

prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

44.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.    Pursuant to sections 9 of the License Agreement, North Beckley agreed to allow RWI to examine, audit, and make copies of North Beckley's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

46.    North Beckley has engaged in acts and practices, as described, which amount to infringement of the Ramada Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

47.    As a result, North Beckley owes restitution and the disgorgement of profits, in an amount unknown to RWI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from North Beckley.

WHEREFORE, RWI demands judgment ordering that North Beckley account to RWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Ramada Marks.

## THIRD COUNT

48.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.    On July 25, 2005, RWI acknowledged North Beckley's termination of the License Agreement.

50.    Section 20 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, North Beckley shall pay liquidated damages to RWI within 30 days of termination.

51.    As a result of the termination of the License Agreement, North Beckley is obligated to pay RWI liquidated damages in the amount of $122,000, as calculated pursuant to section 28(f) of the License Agreement.

52.    Notwithstanding RWI's demand for payment, North Beckley has failed to pay RWI the liquidated damages as required in sections 20 and 28(f) of the License Agreement.

53.    RWI has been damaged by North Beckley's failure to pay liquidated damages.

**WHEREFORE**, RWI demands judgment against North Beckley for liquidated damages in the amount of $122,000, together with interest and costs of suit.

### FOURTH COUNT

54.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 53 of the Complaint.

55.    By virtue of the premature termination of the License Agreement, RWI sustained a loss of future revenue over the remainder of the fifteen-year term of the License Agreement.

56.    If the Court determines that North Beckley is not liable to pay RWI liquidated damages as required by sections 20 and 28(f) of the License Agreement then, in the alternative, North Beckley is liable to RWI for actual damages for the premature termination of the License Agreement.

57.    RWI has been damaged by North Beckley's breach of its obligation to operate a Ramada guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, RWI demands judgment against North Beckley for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

58.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 57 of the Complaint.

59.    Pursuant to section 8, section 28(b), and Schedule C of the License Agreement, North Beckley was obligated to remit Recurring Fees to RWI.

60.    Despite its obligation to do so, North Beckley failed to remit certain of the Recurring Fees due and owing under the License Agreement in the current amount of $36,241.60.

61.    North Beckley's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged RWI.

**WHEREFORE**, RWI demands judgment against North Beckley for the Recurring Fees due and owing under the License Agreement, together with interest and costs of suit.

## SIXTH COUNT

62.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 61 of the Complaint.

63.    At the time of the termination of the License Agreement, North Beckley was obligated to pay RWI Recurring Fees.

64.    Despite its obligation to do so, North Beckley failed to pay certain of the Recurring Fees due and owing under the License Agreement in the current amount of $36,241.60.

65.    In addition, North Beckley benefited from its wrongful use of the Ramada Marks after termination of the License Agreement and paid no royalty or other Recurring Fees to RWI in return for that benefit.

66.    North Beckley's failure to compensate RWI constitutes unjust enrichment and has damaged RWI.

**WHEREFORE**, RWI demands judgment against North Beckley for the Recurring Fees due and owing under the License Agreement, together with interest, costs of suit and all royalties and other Recurring Fees that should be paid to compensate RWI for the period during which North Beckley misused the Ramada Marks and was thereby unjustly enriched, together with interest and costs of suit.

## SEVENTH COUNT

67.    RWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 66 of the Complaint.

68.     Pursuant to the terms of the Guaranty, Milam and Madison agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of North Beckley under the License Agreement.

69.     Despite their obligation to do so, Milam and Madison have failed to make any payments or perform or cause North Beckley to perform each obligation required under the License Agreement.

70.     Pursuant to the Guaranty, Milam and Madison are liable to RWI for North Beckley's liquidated damages in the amount of $122,000, or actual damages in an amount to be determined at trial, and North Beckley's Recurring Fees due and owing under the License Agreement, and for those additional Recurring Fees attributable to the period during which North Beckley has misused the Ramada Marks.

**WHEREFORE**, RWI demands judgment against Milam and Madison for damages in the amount of:

(a)     All liquidated damages or actual damages and Recurring Fees due and owing under the License Agreement, together with interest and costs of suit; and

(b)     All profits, royalties, and other Recurring Fees that should be paid to compensate RWI for the period during which North Beckley misused the Ramada Marks and was thereby unjustly enriched, together with interest and costs of suit.

CONNELL FOLEY LLP
Attorneys for Plaintiff,
Ramada Worldwide Inc.


By: _____
        MATTHEW W. BAUER (MB7354)


## DISCLOSURE STATEMENT PURSUANT TO FED. R. CIV. P. 7.1

Pursuant to Federal Rule of Civil Procedure 7.1 and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for Plaintiff, Ramada Worldwide, Inc. (a private non-governmental party) certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held: Wyndham Worldwide Corporation

CONNELL FOLEY LLP
Attorneys for Plaintiff,
Ramada Worldwide Inc.


By: _____
        MATTHEW W. BAUER (MB7354)

# EXHIBIT A

Mt. Hope, WV
File No. 2081

## RAMADA
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated _February 18_, 199_7_, is between RAMADA FRANCHISE SYSTEMS, INC. (the "Company"), a Delaware corporation, and NORTH BECKLEY MOTEL CORP., a _____ corporation, ("Licensee"). The definitions of all capitalized terms used and not defined herein may be found in Appendix A attached hereto and made a part hereof. In consideration of the following mutual promises, the parties agree:

1. **Ramada System.** The Company has acquired from Franchise Systems Holdings, Inc. ("FSH") pursuant to the Master License Agreements the right to use and to sublicense certain trade names, trademarks and service marks including the Marks and the distinctive Ramada System for providing hotel services to the public under the "RAMADA" name and certain services to its licensees, including the Reservation System, advertising, marketing and training services. The Company reserves the right, in its sole discretion, to amend, delete or enhance any portion of the System, including any of the Marks, to maintain or enhance System reputation or to improve System license marketability.

2. **License.** The Company grants, effective and commencing only upon the Opening Date, and Licensee accepts, the License. Licensee acknowledges that the License is a non-exclusive license. Any additional or secondary names or geographic designations to be used by the Licensee or in connection with the Facility may be adopted by Licensee only with the Company's prior written consent which may be withheld, conditioned or withdrawn in the Company's sole discretion.

3. **Renovation Obligation.**

(a)    Licensee must commence renovation of the Facility no later than thirty (30) days after the Effective Date and complete conversion and renovation of the Facility in accordance with the Renovation Obligation and be ready, willing and able to open the Facility for business under the System no later than **one hundred eighty(180)** days after the Effective Date, except as otherwise set forth in Schedule B. In addition to completion of the specific items set forth in the upgrading addendum attached to this Agreement as part of Schedule B, in order for the Facility to be ready to open for business under the System, the Facility must score a 400 or equivalent on its pre-opening quality assurance inspection. If (i) Licensee fails to commence or complete the conversion and renovation of the Facility by the dates specified in this Section 3, (ii) the Facility fails to score a 400 or equivalent on its pre-opening quality assurance inspection, or (iii) fails to maintain not less than a 400 or equivalent during the nine months immediately following the Facility's opening under the System or to achieve not less than

a 425 or equivalent quality assurance score by the date which is nine (9) months after the date the Facility opens under the System, then in addition to the Company's rights under Section 19, and subject to the granting of an extension as provided below, the Company may, in its sole discretion, terminate this Agreement by giving written notice to Licensee. The Company may, however, in its sole discretion, grant one or more extensions of the dates for compliance set forth above, provided that the grant of such extension(s) shall not constitute a waiver of any other default existing at the time such extension is granted.

(b)    Licensee will, at its expense and the Company's request, create renovation plans and specifications (based upon Schedule B and the Design Standards) which must be submitted to the Company. Licensee will not commence renovation unless and until the Company shall have first given its written approval (which approval shall not be unreasonably withheld) to such renovation plans and specifications, (after approval, the "Approved Construction Plans"). Such approval right is intended only to ascertain initial compliance of the submitted plans and specifications with System Standards, and not to detect errors or omissions in the work of Licensee's architects, engineers, contractors or the like. The Company's review constitutes neither (i) approval of technical, architectural or engineering factors nor (ii) verification that such plans and specifications conform with federal, state or local laws, regulation or code requirements. It is further understood and agreed that the Company (or its agents, subsidiaries or assigns) shall not be liable to Licensee, its lenders, contractors, employees, guests or others on account of (1) the review or approval of any such plans, drawings or specifications, (2) any inspection of construction conducted during construction or upon completion of the Facility, and (3) any construction or operation of the Facility pursuant to any such plans, drawings or specifications. Any modifications to or variances from the Renovation Obligation require the Company's prior written approval. Licensee shall promptly provide the Company with copies of such permits, job progress reports, and other information as the Company requests, and shall allow the Company to inspect renovation while in progress without prior notice.

(c)    Notwithstanding the foregoing, Licensee shall not commence renovation (i) until it receives a fully executed original of this Agreement and (ii) unless it first secures and maintains, or causes its general contractor to secure and maintain, a policy of commercial general liability insurance containing coverage, conditions and for amounts not less than those required of Licensee as set forth in Section 13 hereof, with the Company (and its agents, affiliates and assigns) named as an additional insured, and with a provision for a thirty (30) day written notice of cancellation to the Company.

(d)    Licensee will not commence any operation of the Facility as part of the System without first obtaining approval from the Company that the pre-opening requirements specified on Schedule B have been satisfied.

(e)    Notwithstanding anything contained in this Agreement to the contrary, under no circumstances shall Licensee make use of any Marks in interior or exterior signage, use any Mark-bearing supplies or materials in guest rooms or public areas, or otherwise identify the Facility as part of the System prior to the Opening Date without the express prior written

consent of the Company in each and every instance, or as permitted under and strictly in accordance with the System Standards.

4. **Proprietary Rights**. Licensee acknowledges and will not contest the Company's right, title and interest in and to the System and the Company's right to grant franchises for use of the System. Licensee will not contest the validity of the Marks, or any other System intellectual property. Licensee recognizes that any use of the System, other than pursuant to this Agreement, will cause the Company irreparable harm for which there is no adequate remedy at law, entitling the Company to injunctive and other relief. Without limiting the foregoing:

(a) Marks and System. Licensee does not have and will not acquire any interest in or right to use the System or Marks except under this Agreement. Licensee may not apply for federal, state or foreign registration of the Marks, or use the Marks in its legal or tradename.

(b) Inurements. All present and future distinguishing characteristics, improvements and additions to or associated with the System, whether made by the Company, Licensee or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations now or hereafter applied for or granted in connection with the System, shall be the property of the Company or FSH, as applicable, and shall inure to their respective benefit, and Licensee shall not use or permit others to use any of the same without the Company's written approval.

(c) FSH Rights. In the event the Company's rights to (i) any of the Marks or the Ramada System shall be terminated pursuant to the terms and conditions of the Master License Agreements (other than as a result of a purchase option being exercised as set forth therein), or (ii) the Company shall liquidate, dissolve or otherwise cease to do business, then FSH or its assignee shall have the right to succeed to all of the Company's rights in, to and under this Agreement and any other agreements between the Company and Licensee entered into pursuant to the terms of this Agreement, and in such event FSH or its assignee shall be obligated to perform the Company's duties and assume all of the Company's obligations under any such agreements.

(d) Other Systems. The Company and its affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging, restaurant and/or other food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with Licensee and/or others (for separate charges) for use of any such non-System marks or other proprietary rights, and (ii) other lodging, restaurant, other food and beverage facilities, and/or other businesses, under the System utilizing modified System Standards.

(e) Disclosure. Licensee shall take such steps as are necessary and such steps as the Company may from time to time reasonably request, to minimize the chance of a claim being made against the Company for anything that occurs at the Facility or for acts, omissions or

obligations of Licensee or anyone associated or affiliated with Licensee or the Facility. Such steps may, for example, include giving notice in guest rooms, public rooms and advertisements, on business forms and stationery, etc., making clear to the public that the Company is not the owner or operator of the Facility and is not accountable for what happens at the Facility. Licensee, its principals, or employees shall not represent to any actual or proposed lender, investor, guest, customer, supplier or other person or entity that the Company or its affiliates have an ownership interest in Licensee or the Facility, or that the Company or its affiliates are or will be in any way responsible for Licensee's debts or acts, or are participating in any investment offering.

(f)    Confidential Information. The Company will lend Licensee one copy of each current System Standards Manual, and copies of all separate policy statements in effect from time to time. The Company will deliver to Licensee from time to time any System Standards Manual revisions and/or supplements. Licensee shall take all appropriate actions (including execution of appropriate employee and third-party confidentiality agreements) to preserve the confidentiality of all Confidential Information. Licensee shall take appropriate precautions to ensure that access to Confidential Information is limited to authorized Licensee personnel (and subcontractors, but only with the written consent of the Company) who have first signed a confidentiality agreement and shall then permit access only on a need-to-know basis. Licensee shall not permit copying of Confidential Information (including, with respect to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software) and shall use Confidential Information only for the Facility and pursuant to this Agreement. Upon termination, (or earlier, as reasonably requested by the Company), Licensee shall return to the Company all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended from time to time.

Licensee's obligations under this subsection shall commence upon execution of this Agreement and continue until the earlier of ten (10) years from the date the Term ends or the longest time after such termination permitted by applicable law, regardless of the reason for termination. Licensee acknowledges that, while some of the information contained in the Confidential Information may already be known to Licensee or its personnel or be in the public domain, the compilation of such information has cost the Company great effort and expense and affords any person to whom such information is disclosed a competitive advantage over persons who do not have such information or the compilation contained in the Confidential Information. Licensee further acknowledges that such disclosure would cause the Company great and irreparable injury, for which there may be no adequate remedy at law. Licensee shall be liable for damages sustained by the Company as a result of any disclosure of any of the Confidential Information, and the Company shall be entitled to any and all legal and equitable remedies afforded by law as a consequence of any breach of this Section 4(f), including reasonable attorneys fees.

(g)    Litigation. Licensee shall promptly notify the Company, in writing, (i) of any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential

4

Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) Licensee, the Company or any of the Company's affiliates.

The Company will have the sole right and responsibility to handle disputes with third parties concerning use of all or any part of the System, and Licensee will, at its reasonable expense, extend its full cooperation to the Company in all such matters. The Company need not initiate suit against imitators or infringers, or any other suit or proceeding to enforce or protect the System. Licensee will make every effort consistent with the foregoing to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other service marks, trademarks, slogans, or other constituent part of the System.

(h)    Commonality.  Licensee acknowledges that the Company is affiliated with or in the future may become affiliated with other hotel or other hotel franchise systems that operate under names or marks other than the Marks. Nothing herein shall be construed to prevent the Company from using a common reservation system, franchise application procedure and/or committee, marketing and advertising programs, administrative personnel, central purchasing, approved supplier lists, franchise marketing personnel (or independent franchise sales representatives), etc. for the benefit of other hotel systems affiliated with the Company.

5.    System Standards.  The Company shall have the right to control and establish requirements for all aspects of the System. Licensee shall comply with all System Standards (as embodied in the System Standards Manual or otherwise), as amended, supplemented or replaced. Without limiting the foregoing:

(a)    Specification.  The Company may from time to time specify System Standards in any manuals, policy statements or revisions as the Company adopts, all of which Licensee shall meet, at its sole expense. Licensee acknowledges that the Company may, in its sole discretion, permit deviations from System Standards, based on local conditions and/or the Company's assessment of special circumstances.

(b)    Inspections.  The Company has the unlimited right to conduct unannounced inspections of the Facility and its operations, records and Mark usage up to four (4) times per year both prior to and during the Term, to ascertain Licensee's compliance with System Standards and this Agreement and, in addition, the unlimited right to reinspect in the event of a failed inspection. Licensee shall pay the reasonable, actual travel, lodging and meal expenses of the Company's representatives if reinspection of the Facility is required due to Licensee's failure to meet System Standards at any prior inspection. Licensee acknowledges that all inspections are solely for the purposes of ascertaining compliance with System Standards and not to ascertain Licensee's compliance with any federal, state or local laws, regulations or code requirements applicable to the Facility.  Neither the Company, its affiliates, nor their representatives, agents or contractors assume any responsibility or liability to Licensee, its lenders, contractors, employees, guests or others by reason of such inspections or approvals.

5

6.    **Term**. The Term commences upon the Effective Date and terminates (unless sooner terminated as provided herein) on the day prior to the fifteenth anniversary of the Effective Date. The Company shall confirm the Opening Date in writing, and upon request of the Company, Licensee and the Company shall execute a Declaration of License acknowledging the Opening Date. Certain of the Licensee's duties and obligations shall survive termination of this Agreement, as provided herein. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

7.    **Initial Fees**. Licensee has paid the Company a non-refundable application fee (the "Application Fee") of $1,000.00 which fee is to defray the costs of evaluating Licensee's application and which will be applied against the Initial Fee hereinafter described. In addition, Licensee shall pay a non-refundable initial franchise fee (the "Initial Fee") in the amount of $42,700.00, which Initial Fee is payable upon execution by Licensee of this Agreement and is fully earned by the Company upon payment thereof, as compensation for the grant of the License.

8.    **Recurring Fees**.

(a)    Recurring Fees shall accrue monthly (except as provided herein) commencing on the Opening Date, and are payable to the Company in U.S. dollars by the 10th day of the month following the month in which they accrue, without formal billing or demand by the Company. Such Recurring Fees shall include the following:

(i)    Royalties. A "Royalty" of 4% of Gross Room Revenues.

(ii)    RINA Services Assessment Fee. A "RINA Services Assessment Fee" of 4.5% of Gross Room Revenues for advertising, marketing, training, the Reservation System and other related services and programs. This Fee is collected, disbursed and administered by the Company on behalf of RINA and is maintained in a separate account or accounts. The RINA Services Assessment Fee is subject to change, and new fees and charges may be accessed for new services, but only upon the recommendation of the Executive Committee of the Ramada Inter-National Association ("RINA") and approval by the Company.

(b)    An amount equal to any federal, state or local sales, gross receipts, use or similar taxes assessed against the Company with respect to the Recurring Fees, if any, but not including any income tax or optional alternative to income tax, is payable to the extent permitted by applicable law, within 15 days of Licensee's receipt of the Company's invoice.

(c)    Interest shall accrue at the rate of the lesser of 1.5% per month or the maximum rate permitted by applicable law from the due date of any payment due pursuant to this Agreement which remains unpaid beyond any applicable grace period and shall be payable immediately upon Licensee's receipt of the Company's invoice.

9.    **Records, Reports and Audits.**

(a)    Records.  Licensee shall maintain books and records for the Facility, including, but not limited to, books of account, tax returns, governmental reports, daily reports and complete quarterly and annual financial statements (profit and loss statements, balance sheets and cash flow statements), all in accordance with the Uniform System of Accounts for Hotels established by the American Hotel and Motel Association, as amended from time to time.  The Company shall have the option to specify another system of accounts.  Licensee shall preserve such books and records for at least 5 years from their respective preparation dates.

(b)    Monthly Reports.  On or before the 10th day of each month (or portion thereof) commencing with the month after the Opening Date, Licensee shall send the Company a written financial report in the form prescribed by the Company (including, but not limited to, monthly financial information, Gross Room Revenues, number of rooms sold and average daily room rates), and the computation of all due and payable Recurring Fees.  Licensee shall submit any other reports, data and information including, but not limited to, accurate room rate and availability information for Reservation System and Directory purposes as the Company requests.

(c)    Financial Statements.  Upon written request by the Company, Licensee shall send to the Company in the form prescribed by the Company, an annual financial statement (including profit and loss statement, balance sheet and cash flow statement) for the period ending on the last day of the Facility's fiscal year.  Such annual financial statements shall be audited if an independent audit is required by Licensee's lenders or is otherwise prepared at the Licensee's option; otherwise, they shall be accompanied by written certification of Licensee's chief financial officer that such statements fairly present the Facility's financial condition and operating results for such fiscal year.

(d)    Audits.  From the Opening Date until twelve (12) months after the expiration of the Term, Licensee shall permit the Company (or affiliates) and/or any independent accountants selected by the Company to audit, without prior notice, any Facility financial records.  If such audit discloses a deficiency in any Recurring Fees due the Company, Licensee shall immediately pay the deficiency and any accrued interest.  If the deficiency is greater than 3% of the amount paid for the period for which the deficiency exists, then Licensee shall also pay within 10 days of receipt of the Company's statement, the audit costs and expenses.  If the audit discloses an overpayment, the Company will, at its option, refund such overpayment to Licensee within 10 days of the Company's receipt of the audit report or offset such overpayment against Recurring Fees then owed by Licensee.  If three or more such audits disclose a deficiency for which Licensee is obligated to pay the audit costs and expenses, then the Company shall have the right, in its sole discretion, to require, prior to the start of any fiscal year, certified annual financial statements for that year and any subsequent year specified by the Company, at Licensee's expense.

7

10.  **Reservation System**.

(a)    The Company will maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized central reservation system and/or such technological substitute(s) as the Company determines, in its sole discretion (the "Reservation System"). Licensee will, commencing with the Opening Date and throughout the balance of the Term, participate in the Reservation System and comply with all related System Standards including, without limitation, standards for (i) purchase or lease and maintenance of computer/teletype terminal equipment, communications equipment and service, and/or computer hardware and software and (ii) honoring prepaid, confirmed, guaranteed and other reservations for the Facility accepted through the Reservation System.

(b)    Because of the extreme importance of maintaining Reservation System standards and Reservation System-related proprietary information and technology, Licensee acknowledges that the Company may, in its sole discretion, require Licensee to lease, license or otherwise acquire Reservation System computer software and hardware directly from the Company, its affiliates and/or its designees pursuant to separate written agreements containing such terms, conditions and prices as reasonably determined by the Company from time to time. The Company may consent to the acquisition of Reservation System computer hardware from a third party vendor if it is in a configuration identical to the hardware offered by the Company.

(c)    Licensee shall pay all Facility telephone line connection charges, supply costs and other charges for communication needed to participate in the Reservation System.  The Company may pay travel agents' commissions, fees charged by airline or cruise ship line reservation services or other similar fees attributable to reservations for the Facility booked through the Reservation System, and the Company shall receive reimbursements of such payments, together with a reasonable service or handling charge, from Licensee within thirty (30) days after the date of any invoice therefor.

(d)    Licensee shall keep the Central Reservation System advised of the availability of rental units by room type at its Facility and will maintain a daily room inventory of not less than 90 percent of its unsold rooms in the Central Reservation System.  Licensee shall accept reservations on the basis of rates per guest room type which Licensee submits from time to time to the Company.  Licensee shall honor all requests to place reservations through the Central Reservation System and shall indemnify and hold the Company harmless against overbooking of its guest rooms through the Reservation System or otherwise.  Licensee hereby authorizes the Company to assemble and furnish all other licensees with all rental unit availability information obtained concerning Licensee's Facility.  Licensee shall not use the Reservation System or any information it provides to refer guests, directly or indirectly, to any non-System hotel.

(e)    Licensee may be suspended from the Reservation System for any default of this Agreement.  The Company may, in its sole discretion, also discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other System hotels after the effective date of such notice and until such

8

suspension has been rescinded. Reservation service shall only be restored after Licensee has fully cured any defaults or successfully passed a quality assurance reinspection. Licensee waives all claims against the Company or subcontractors arising from any **proper** removal of the Facility from the Reservation System under this Section 10.

(f)    Notwithstanding anything to the contrary contained in this Agreement, the Company shall have the right to provide reservation services to non-System properties or other lodging systems, provided that such provision of services does not result in a direct increase of costs to System licensees.

11.    <u>Marketing</u>.

(a)    <u>National and Local Advertising</u>. The Company, utilizing RINA Services Assessment Fees, will implement national advertising and other marketing programs to enhance and promote public awareness and patronage of System facilities. The Company shall have sole discretion regarding the nature and type of media placement, advertising copy and other aspects of the advertising program. The Company, directly or through its affiliates and at its sole discretion, may implement local advertising and/or marketing programs which may or may not encompass the Facility. RINA Services Assessment Fees may be used by the Company, in whole or in part, to reimburse the Company's reasonable direct and indirect costs, overhead or other expenses of providing marketing services.

(b)    <u>Special Advertising Programs</u>. The Company may, at its sole discretion, implement "special" and/or non-recurring international, national, regional or local System promotional programs (which may or may not encompass the Facility) and may make available to Licensee (to use at its option) media advertising copy and other marketing materials for prices which reasonably cover the Company's direct and indirect costs.

(c)    <u>Group Booking Programs</u>. The Company, may, at its sole discretion, implement "group booking" programs created to encourage use of System hotels for tours, conventions and the like. The Company reserves the right to charge separate fees for any resulting group booking accepted at the Facility.

(d)    <u>Licensee Advertising</u>. Licensee shall (at its expense, but subject to the Company's prior approval) implement a pre-Opening Date local advertising program. Thereafter, Licensee may implement (at its option and expense) its own local advertising. All Licensee implemented advertising materials must comply with System and Mark Standards and be approved in writing by the Company prior to publication. The Company shall have the right to compel Licensee to discontinue use of any previously approved advertising materials.

(e)    <u>Licensee Co-operation</u>.

(i)    The Company shall publish a System directory which shall include, at a minimum, the names and addresses of System hotels. Licensee shall comply with procedures

9

established from time to time in the System Standards Manual and/or policy statements pertaining to the directory. Licensee shall not charge any party more than the applicable rate(s) as published from time to time in the then current System directory, unless the Company has consented in writing (due to special circumstances). The Company shall supply System directories to Licensee and Licensee shall display the current System directory in each Facility guest room, and at such other locations within the Facility as are specified in the System Standards Manual and/or policy statements. The Company reserves the right to assess Licensee a reasonable charge to reimburse the Company for its direct and indirect expenses (including overhead) of providing the directories to Licensee.

(ii)    Licensee shall participate, at its expense and to the extent permitted under applicable law, in all regular and special System marketing programs designated as mandatory and cooperate with special promotional and discount programs, optional marketing programs, market research programs, and the display and use of System brochures and promotional materials.

12.    <u>Training and Consulting Services</u>.

(a)    <u>Minimum Training</u>.  The person(s) who will act as the general manager of the Facility must complete a hospitality management training program to the Company's satisfaction between 30 days prior to the anticipated Opening Date of the Facility and six months after the Opening Date.  Any supplemental or replacement manager must also complete this mandatory training program, preferably 60 days prior to assuming the general manager's duties but in no event later than six months after employment.  The training program shall be held at such location as the Company may designate and shall cover the Ramada System and its resources, as well as operational topics such as quality assurance, marketing, cost control, customer service and personnel management.  In addition to the above, a property opening training program shall be provided by the Company at the Facility for its staff.  This mandatory program will cover such subjects as the Reservation System, front desk procedures and Ramada marketing programs.

(b)    <u>Supplemental Training/Resources</u>.    The Company, its affiliates and/or subcontractors may in the future offer additional optional or mandatory courses and/or training materials.

(c)    <u>Training Expenses</u>.  Mandatory training shall be provided by the Company without tuition charge, except that the Company shall have the option to charge reasonable tuition for Licensee's replacement persons.  The Company may charge (i) tuition for optional training (including training at mandatory sessions of persons in addition to those required by the Company to receive such training), and (ii) fees for instructional materials.  Licensee will bear all travel, lodging, food and other out-of-pocket attendance expenses of its training program attendees, and most of such expenses of the Company's representatives if the training is conducted at the Facility.

10

13.    **Insurance and Indemnity**.

(a) Insurance Requirements.  During the Term and for a period of not less than six (6) months after the termination of this Agreement or for so long as the Facility continues to be identified as a System facility, whichever is longer, Licensee will secure and maintain commercial general liability insurance on an occurrence basis per location (with contractual and product liability, completed operations, independent contractors and escalator coverage), providing protection for personal injury, bodily injury and property damage with combined single limits of not less than Five Million Dollars ($5,000,000.00) per occurrence.  Such insurance may be provided in the form of $1,000,000.00 in primary insurance coverage and $4,000,000.00 in umbrella coverage.  The Licensee shall name the Company and its affiliates, (including its parents and any subsidiaries) as additional insureds.  The types, forms and amounts of insurance required may be changed, modified or increased by the Company as it deems necessary.  In addition to commercial general liability insurance, Licensee agrees to secure and maintain:

(i)    comprehensive automobile liability insurance in the form and amounts set forth above;

(ii)    employer's liability and worker's compensation insurance as prescribed by applicable law;

(iii)    dram shop and/or liquor liability, if the Facility is in a jurisdiction having a Dram Shop Act and if it is licensed to serve, dispense or sell alcoholic beverages;

(iv)    fire, extended coverage, vandalism and malicious mischief insurance, insuring the construction, improvements, equipment and completed buildings comprising the Facility for no less than 80% of the full insurable replacement cost thereof; and

(v)    all insurance required under any lease or mortgage covering the Facility.

(b)    Construction Period.  In connection with all significant construction at the Facility during the Term, Licensee will cause the general contractor to maintain commercial general liability insurance (with contractual and product liability, completed operations, independent contractors and escalator coverage) in an amount of not less than Five Million Dollars ($5,000,000.00).  Such insurance may be provided in the form of $1,000,000.00 in primary insurance coverage and $4,000,000.00 in umbrella coverage.

(c)    Annual Renewals.  Simultaneously with the execution of this Agreement, annually thereafter, and each time a change is made in any insurance policy or insurance carrier, Licensee will furnish to the Company, a certificate of insurance evidencing the insurance coverages in effect, the named insured and additional insureds, and endorsed with a statement that the coverage may not be cancelled, altered or permitted to lapse or expire without thirty (30) days advance written notice to the Company.  In the case of commercial general liability

11

insurance, comprehensive automobile insurance, dram shop or liquor liability insurance, and the general contractor's commercial general liability insurance, the Company and its affiliates (including its parents and subsidiaries) shall be named as additional insureds.

(d)    Policy Requirements. All policies required by this Agreement shall be written by insurance carriers rated "A" or better by A.M. Best in Class XII or larger, and approved by and satisfactory to the Company. Said carriers shall be authorized to do business in the jurisdiction in which the Facility is located. All policies shall provide that the insurer waives any right of subrogation against the Company. The original insurance policies and certificates of insurance shall name the Company and its affiliates, (including its parent and any subsidiaries) as additional insureds.

(e)    Indemnity. Independent of its obligation to procure and maintain insurance as specified in this Agreement, at its expense Licensee will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee in connection with any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at or in conjunction with the operation of the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, Licensee, any party associated or affiliated with Licensee, or any of their respective owners, officers, directors, employees, agents or contractors, including when the active or passive negligence of any Indemnitee is alleged or proven. Licensee shall have no obligation to indemnify an Indemnitee for property damage or personal injury if the Indemnitee is proven to have engaged in willful misconduct or intentionally caused such property damage or bodily injury. Such exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

In the event that an Indemnitee is required to respond to any matter described in the preceding paragraph, Licensee will, at the Company's election, respond and defend the Indemnitee. In the event that Licensee fails to defend the Indemnitee when requested, Licensee will reimburse the Indemnitee for all costs and expenses, including attorneys' fees, incurred by the Indemnitee. Regardless of Licensee's obligation to indemnify and defend under this Subsection, the Indemnitee has the right, through counsel of its choice and at Licensee's expense, to control any matter to the extent said matter could directly or indirectly adversely affect the Indemnitee. The obligations of Licensee pursuant to this Subsection (e) shall survive termination of this Agreement.

14.    **Ramada Inter-National Association.**

(a)    Licensee Association.    Upon execution of this Agreement, Licensee automatically becomes a member of RINA, an unincorporated association. Other licensees of the System and Ramada are also members of RINA. RINA may consider and discuss common

issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to Ramada regarding such issues and other matters.

      (b)    Annual RINA Conference. A RINA franchise conference is held each year. The conference date and location will be determined by the RINA Executive Committee after consultation with the Company. Licensee shall pay not less than one "Conference Registration Fee" for each Facility. Upon payment of the Conference Registration Fee, Licensee may send its representative to the conference. Additional Facility representatives may attend subject to conference policies and after payment of an additional Conference Registration Fee for each such additional attendee. The costs of transportation, lodging and meals (except those provided by the Company as part of the conference) for the attendee will be borne by Licensee.

      15.   **Approved Supplier Lists/Central Purchasing**. The Company shall have the right, in its sole discretion, to designate services or products of third party suppliers as "Approved" and maintain an "Approved Supplier List" of such suppliers and, in general, such designation shall constitute acknowledgment of compliance with System Standards. The Company reserves the right to designate on the Approved Supplier List products and services which are not then subject to System Standards and also to offer products and services for sale or lease through the Company or its affiliates. Licensee is not obligated to purchase non-Mark-bearing products or services which otherwise meet System Standards from Approved Suppliers; however, Mark-bearing items shall be purchased only from Approved Suppliers. The Company will publish in its System Standards Manual procedures by which Licensee-selected sources of Mark-bearing and non-Mark-bearing products and services can become Approved. Such procedures shall include the inspection and testing of products and services covered by System Standards and utilized at the Facility, but purchased or acquired by Licensee from sources not on the Approved Suppliers List. Any contract (including its prices, terms and conditions) which results from Approved Supplier List shall be strictly between the Approved Supplier and Licensee; and neither the Company nor any of its affiliates shall be deemed to be a seller, distributor, title-holder or warrantor of any products or services so purchased or guarantor of the purchase price or other terms and conditions of any such products or services. THE COMPANY, FOR ITSELF, AND ITS AFFILIATES, DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES CONCERNING SYSTEM-APPROVED PRODUCTS OR SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AVAILABILITY, QUALITY OR PRICING OR PROFITABILITY. Licensee acknowledges that the Company may receive fees, commissions, field-of-use license royalties, or other consideration from Approved Suppliers based on sales to System licensees, and that the Company may charge non-Approved Suppliers reasonable testing or inspection fees.

      16.   **Additional Licensee Duties**.

      (a)    Best Efforts. Subject to applicable law, Licensee will exercise best efforts to (i) maximize the good will, guest satisfaction and usage of the System and the Facility and to recommend and promote all other System hotel activities; (ii) provide Facility guests

complimentary items and services as the Company from time to time specifies in the System Standards Manual or policy statements, to the extent permitted by applicable law, (iii) maintain sufficient working capital and maintenance and renovation reserves to fulfill its obligations pursuant to this Agreement; and (iv) not permit its employees, representatives, or guests to engage in conduct which is unlawful or damaging to the good will of the System.

(b)  <u>Food, Beverage and Other Services</u>.  Licensee shall operate only the approved Food and Beverage and other services as shown on Schedule B for the Term, unless it first obtains the Company's written consent to add to, modify or discontinue such services. Licensee shall obtain the Company's written consent before entering into any subcontract or lease with third parties for Food and Beverage and other so-called "concession" services at the Facility, provided that subcontracted or leased services shall be subject to System Standards and insurance requirements as set forth in the System Standards Manual, **which consent shall not be unreasonably withheld.**

(c)  <u>Compliance with System</u>.  During the Term, Licensee will do all of the following: (i) maintain a high moral and ethical standard of operation at the Facility; (ii) comply with all governmental laws and requirements, pay all taxes; and maintain all governmental franchises and permits necessary for operation of the Facility in accordance with the System; (iii) maintain the Facility in a clean, attractive and orderly condition, using standards established by the Company applicable to hotels in the System; (iv) provide efficient, courteous and high-quality service to the public in accordance with the System; (v) operate the Facility continuously and in strict compliance with the System; (vi) provide the Company's training representatives with free lodging when conducting training at the Facility; (vii) advertise and promote the Facility on a local or regional basis subject to the Company's approval as to form and content; (viii) promote only other hotels in the System; and not promote any competing business; (ix) comply with the Company's reasonable requirements so that the quantity and quality of equipment and supplies in the Facility meet the standards and specifications of the System; (x) display outdoor signs and other signs, promotional material and identifying characteristics as approved and required by the Company and used in the System; (xi) recognize and accept for customer credit all credit or consumer debit cards approved by the Company from time to time, and require all lessees or licensees at the Facility to do likewise; (xii) otherwise comply with the Company's requirements and specifications as to the services and products to be used promoted or offered at the Facility; and (xiii) otherwise use all reasonable means to promote and encourage the use of System facilities and reservation centers everywhere by the public and use Licensee's best efforts to create and maintain good will among the public toward the name "Ramada" and toward the System.

(d)  <u>Minor Renovations</u>.  In addition to Licensee's obligations pursuant to Sections 3 and 5 hereof, on and after the third anniversary of the Opening Date, and not more often than the third anniversary of the date of any prior written Minor Renovation Notice, the Company may issue Licensee a written "Minor Renovation Notice." Such notice shall be given at least sixty (60) days in advance of the commencement date specified in such notice. Such notice will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation"),

14