having an aggregate cost for labor, FF&E and materials estimated by the Company to be not more than the Minor Renovation Ceiling Amount. On or prior to the commencement date specified in such Notice, Licensee shall commence such Minor Renovations and shall complete such renovations as specified by the Company. Notwithstanding the foregoing, the Company shall not give a Minor Renovation Notice if the three most recent quality assurance inspection scores received by the Facility immediately prior to the date such Minor Renovation Notice is to be issued averaged not less than 425 or equivalent and the most recent quality assurance inspection score for the Facility was not less than 400 or equivalent.

(e)   Facility Modifications.   Licensee will not materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) without the Company's prior written consent. Licensee shall pay the Company's then current "Rooms Addition Fee" for each additional guest room. Licensee shall obtain the Company's prior written approval of the plans and specifications for such additions before commencing construction. No rooms or facilities addition or material modification of existing facilities, even though previously approved in concept, shall be opened to the public until the Company inspects and certifies in writing that they meet System Standards.

(f)   Courtesy Lodging.   Licensee shall provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to the Company employees and representatives traveling on business, but shall not be obligated to provide more than three standard guest rooms for such purpose at the same time.

17.   **Licensee: Assignments, Transfers and Conveyances.**

(a)   Consent Required.   This Agreement is personal to Licensee. Licensee shall not lease or sublease the Facility to any third party, and will not, directly, indirectly, by operation of law or pursuant to several related transactions assign, transfer, convey, or pledge, except to a Permitted Transferee or with the Company's prior written consent (which may be withheld or conditioned, in its sole discretion):

(i)   any rights under this Agreement;

(ii)   any percentage of Licensee's Equity Interests the transfer of which results in a change in effective control of Licensee from that disclosed on Schedule B;

(iii)   any rights, duties or interests of any general partner of Licensee, if Licensee is a general or limited partnership, including the admission of any substituted or additional general partner; or

(iv)   any interest in the legal or equitable title to the Facility, or if leased to Licensee as lessee, the lessee's leasehold interest in the Facility.

(b)    Interests.    If Licensee is a corporation, Licensee shall not, except with the Company's prior written consent (which may be withheld or conditioned in its sole discretion) merge, consolidate or issue additional stock in Licensee in a transaction which would have the effect of diluting the prior Licensee owners' combined Equity Interests in the surviving entity to less than 51%.

(c)    Registered Securities.    If at least the majority of the Equity Interests of Licensee (or a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling Licensee), are registered under the federal Securities Act of 1933, as amended, or are a class of securities registered under the Securities Exchange Act of 1934, as amended, or are listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), then such registered Equity Interests shall be freely transferable without the application of this Section 17 except in a single transaction or a series of related transactions involving the transfer of more than 20% of the outstanding Equity Interests of Licensee (other than repurchase directly or indirectly, by Licensee).

(d)    Conditions.    The Company may, to the extent permitted by applicable law, condition its consent under this Section 17 upon the receipt of general releases from the Licensee or transferor and each of its owners, the payment of the then current transfer Application Fee and Initial Fee, execution of the then current System license agreement, upgrading of the Facility to meet System Standards then in effect (even if such upgrading costs exceed the Minor Renovation Ceiling Amount), and payment of all amounts then owed the Company and its affiliates by the transferor and the Licensee under this Agreement or otherwise.

(e)    Attempted Transfers.    Any attempted transfer, lease, sublease, assignment or pledge which is not in accordance with this Section 17 shall be void and shall give the Company the right to terminate the License and exercise other rights and remedies, including those under Sections 19 and 20, and until such termination and complete deidentification of the Facility Licensee shall nevertheless continue to be liable for Recurring Fees and/or any appropriate damages to which the Company may be entitled under applicable law, including, but not limited to treble damages pursuant to the Lanham Act.

(f)    Ownership Changes.    Licensee shall give the Company at least 90 days prior written notice of the terms and conditions of any conveyance requiring the Company's consent, and shall notify the Company within 30 days thereafter of a transfer to a Permitted Transferee, under this Section 17. In addition, Licensee will notify the Company in writing at least 30 days in advance of the occurrence of any change, through a single or series of related transactions, of (i) 20% or more of the beneficial ownership of Licensee, or (ii) any percentage of the ownership of the Facility, if not owned by Licensee. If Licensee is a partnership or joint venture, it will promptly notify the Company of the death or unplanned retirement of any general partner and/or any cumulative change of 20% or more in the right to receive distribution of Licensee's profits and losses. Licensee shall, from time to time, but only if the Company so

16

requests, provide the Company with lists of the equity owner(s) of Licensee and/or the Facility, and their respective interests.

18. **Assignments by the Company**. The Company may assign or subcontract all or any part of its rights and duties under this Agreement, including by operation of law, without notice and without Licensee's consent.

19. **Termination**.

(a) Termination by the Company with Notice. The Company may terminate this Agreement at any time, effective upon the date specified in the termination notice (or the earliest date permitted by applicable law) if: (i) Licensee fails to submit monthly reports then due under Section 9(b) within 10 days after receipt of the Company's written demand; (ii) Licensee fails to pay any amount then due to the Company under this Agreement or otherwise within 10 days after receipt of the Company's written payment demand; (iii) Licensee fails to remedy any other breach of its obligations or warranties under this Agreement within 30 days (5 days for breach of Section 4(f)) after receipt of written notice from the Company specifying one or more breaches of this Agreement, or such longer time as the Company may in writing allow; (iv) Licensee loses possession of or the right to possess all or a significant part of the Facility; (v) Licensee defaults in the performance of the terms and conditions of any other agreement with, the Company or its affiliates, or any mortgage, deed of trust or lease covering the Facility, and fails to cure such default within the time permitted by the applicable instrument; (vi) Licensee knowingly maintains false books or records, or knowingly submits any false report to the Company; (vii) Licensee fails to pay its debts generally as they fall due; (viii) Licensee makes or made any misstatement or omission of any material fact in connection with this Agreement or its license application; (ix) Licensee fails to deliver within 30 days after the execution and delivery of this Agreement any other agreement with the Company or any other document, deed, instrument, certificate or writing relating to Licensee (including its owners, partners, officers, directors or finances), the Facility, or this Agreement requested by the Company in writing at or prior to execution of this Agreement by the Company, provided that the Company may exercise its right to terminate under this clause only until the later to occur of the Opening Date or the end of a 90 day period after the date of this Agreement; or (x) Licensee shall receive two or more notices of default under this Agreement for the same or a similar cause or reason in any twelve (12) month period, whether or not cured. In any judicial proceeding in which the validity of termination is at issue, the Company will not be limited to the reasons set forth in any notice sent under this Section.

(b) Termination without Notice by the Company. The Company may, in its sole discretion, immediately terminate this Agreement, without notice (or at the earliest time permitted by applicable law) if: (i) Licensee violates or suffers a violation of Section 17; (ii) the Facility ceases to be operated under the System after the Opening Date (except as permitted herein); or (iii) Licensee contests in any court proceeding the ownership of or the Company's right to license the System or any part of it, or the validity of any of the Marks. This Agreement shall automatically and immediately terminate without notice if any involuntary

17

proceeding in bankruptcy is filed against the Licensee which is not dismissed within 60 days of filing, any voluntary proceeding in bankruptcy is filed by Licensee, Licensee is dissolved or liquidated, a receiver is appointed for Licensee or the Facility, or Licensee makes any assignment for the benefit of creditors.

(c)    Casualty and Condemnation.  If the Facility suffers a Casualty such that the Facility cannot continue to be operated in the normal course of business, (with at least 75% of guest rooms and parking available for public lodging), Licensee shall promptly notify the Company in writing of such Casualty, giving information as to the availability of guest rooms and the Facility's ability to honor advance reservations.  Licensee shall advise the Company in writing within 30 days after the Casualty whether it will restore, rebuild and refurbish the Facility to again comply with the Approved Construction Plans, which must be completed within 180 days after the Casualty, or it elects to terminate the License, effective as of the date of notice.  Licensee's failure to make such an election within the time permitted shall be deemed an election to terminate this Agreement.  If Licensee elects or is deemed to have elected to terminate the License, Licensee shall pay all fees accrued prior to such termination and shall follow the post-termination requirements in Section 21.  License shall not be obligated to pay Liquidated Damages.  Once undertaken, Licensee's failure to complete the restoration of the Facility on time or to pursue the same diligently shall entitle the Company to terminate this Agreement under Section 19(a), and Licensee shall be liable to the Company for Liquidated Damages pursuant to Section 20(a).  If a Condemnation occurs, then the License will be deemed terminated on the date the Facility or substantial portion is conveyed to or taken over by the condemning authority.  In the event of such termination, Licensee shall pay to the Company Liquidated Damages as set forth in Section 20(b) upon such termination, together with all other amounts due under this Agreement.

(d)    Non-Waiver.  Termination of this Agreement by the Company or Licensee does not waive any Licensee obligation for accrued, unpaid Recurring Fees (including interest) or other liabilities and obligations arising out of any acts or omissions of Licensee prior to the effective date of termination; and does not waive any obligations of Licensee to perform all applicable provisions of this Agreement after such termination.  The Company reserves all rights at law or in equity, whether or not the Company first terminates this Agreement, including without limitation the right to collect from Licensee by suit or otherwise all amounts due and to suspend or discontinue Reservation System services for the Facility.

20.    **Liquidated Damages.**

(a)    Liquidated Damages.  If this Agreement terminates by action of the Licensee (except as permitted under Section 19(c)) or under Section 19(a) or (b), Licensee shall pay the Company within 30 days following the date of such event, as Liquidated Damages, because actual damages incurred by the Company will be difficult or impossible to ascertain, and not as a penalty, an amount equal to the sum of accrued Recurring Fees during the immediately preceding 24 full calendar months (or such shorter period as equals the unexpired Term at the date of termination, without regard to any express right to terminate the License prior to the

expiration of the Term); provided, however, if the Facility has been open for less than 24 months, then the Licensee shall pay the average monthly Recurring Fees since the Opening Date multiplied by 24, plus any applicable Taxes assessed on such payment. Notwithstanding the foregoing, in no event shall the amount payable pursuant to this Section be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility. Payment of Liquidated Damages shall be in addition to the Company's other rights under this Agreement.

(b) If a Condemnation occurs and Licensee gives the Company notice of termination as provided in Section 19(c) hereof, Licensee shall pay to the Company Liquidated Damages equal to 100% of Licensee's aggregate Recurring Fees which accrued with respect to the Facility during the twelve (12) full months immediately preceding the giving of such notice by Licensee (or such shorter period as equals the unexpired Term at the date of termination, without regard to any express right to terminate the License prior to the expiration of the Term) but not less than $1,000.00 per guest room.

21. **Licensee Duties At and After Termination**. Upon termination of this Agreement for any reason whatsoever:

(a) <u>System Usage Ceases</u>. Licensee shall immediately cease all use of the System, including all Marks and Mark-bearing menus, supplies, signage, stationery, FF&E, and other personalty, return all originals or copies of any System Standards Manual, policy statements or other Confidential Information referred to in Section 4(f), and comply with any post-termination procedures specified in the System Standards Manual. Licensee shall promptly cancel any assumed or fictitious name filing which includes any Mark. Licensee shall immediately direct all telephone companies, travel agents, travel directories and other organizations which identify Licensee's Facility as a System facility, to cease, effective with their next published edition, all references to the Facility as a System facility and, at the request of the Company, shall provide the Company with written confirmation from such third parties of receipt of such direction. Any post-termination Mark usage by Licensee shall be a willful infringement of FSH's and the Company's or trademark and other rights.

(b) <u>Other Company Remedies</u>. The Company (or its representatives) may immediately remove the Facility from the Reservation System and divert reservations as set forth in Section 10. The Company may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove equipment of the Company, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, not removed or obliterated by Licensee on or before the effective date of License termination. The Company's cost of removing signage will be promptly paid or reimbursed by Licensee, and will be added to the amounts of accrued and unpaid Recurring Fees and other amounts to be collected from Licensee, net of the $10.00 purchase price for such signage. Licensee, upon receipt of the Company's written request, shall, at Licensee's sole expense, change any distinctive Facility architectural, trade dress or design features which might lead the public to believe that the Facility is still affiliated with the System. The Company shall have

the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off the aggregate purchase price thereof against any sums then owed the Company by Licensee. The Company shall exercise reasonable care in removing and/or painting over signage, but shall have no obligation or liability to restore or repair damage to the Facility premises or equipment. The Company may give notice to any lessor of Mark-bearing signage or other items to remove such signage and items and terminate the lease obligation of Licensee.

(c)    Advance Reservations. Licensee will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made.

(d)    Survival of Certain Provisions. Licensee's duties and the Company's rights under Sections 4(a)-(h), 8(c), 9(a) and (d), 13(e), 19(d), 20, 22(a)-(f) and 25 as well as all provisions of this Section 21, shall survive termination of this Agreement, whether termination is automatic or initiated by the Company or Licensee, and even if such termination is wrongful.

22.    **Representations, Warranties and Covenants.** The parties disclaim any representation, covenant, or warranty, express or implied, including validity or registrability of any Mark, the tax consequences or potential profitability of the transactions contemplated by this Agreement, or the value or quality of any services or products purchased by Licensee in furtherance of this Agreement, except as expressly set forth in this Agreement, and except that Licensee expressly represents, warrants and covenants to the Company as follows:

(a)    Quiet Enjoyment. Licensee is and will continue to be entitled to possession of the Facility during the entire Term without restrictions that would interfere with its performance under this Agreement.

(b)    Expertise. Licensee has or will employ persons or management firms approved, with the necessary management expertise and experience to design, construct, acquire, develop, equip, operate, market, maintain, and manage the Facility.

(c)    Assumes Risk. Licensee has received, at least 10 business days prior to execution of this Agreement, read and understood the Company's current Uniform Franchise Offering Circular for prospective franchisees (which circular includes a copy of the form of this Agreement), and has had ample opportunity to consult with its advisors. It has independently investigated the risks of the transactions contemplated hereby, and either (i) has substantial prior experience in the construction and operation of hotels and/or motels, or (ii) has obtained, relies with confidence upon, and acknowledges that the Company does not warrant the validity of (even if obtained at the Company's request), advice of third party representatives with such prior or similar experience, and/or a positive market feasibility study for the Facility from a nationally prominent independent accounting or consulting firm. Neither the Company nor any other person on the Company's behalf has made any representation to Licensee not fully set forth herein on which Licensee has relied in entering into this Agreement. Licensee acknowledges

that the reasons for termination under Sections 3 and 19 constitute good cause, and that the notice provisions relating thereto constitute reasonable notice.

(d)   Laws and Taxes.  The Facility will be constructed and operated in compliance with all local, state and federal laws, ordinances, rules and regulations.  Licensee will certify from time to time, as the Company may reasonably require, that it is in compliance with all applicable laws and regulations, and has obtained and maintained all necessary licenses and permits.  Licensee will file all required tax returns and pay when due all required taxes.

(e)   Authority.  Licensee has full power and authority and has been duly authorized, to enter into and perform its obligations under this Agreement, all necessary approvals of any Board of Directors, shareholders, partners, co-tenants and lenders having been obtained.  The execution, delivery and performance of this Agreement by Licensee will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which Licensee or any of its principals is a party or is subject or to which the Facility is subject.  Licensee or the Facility is not the subject of any current or pending dissolution, receivership, bankruptcy, reorganization, insolvency, or similar proceeding on the date this Agreement is executed by the Company and was not within the three years preceding such date, except as disclosed in the Application.  The persons signing this Agreement on behalf of Licensee personally represent and warrant to the Company that they are authorized to execute this Agreement and any other agreement with the Company for and on behalf of Licensee and have full authority to so bind Licensee.

(f)   No Misrepresentations.  Licensee and its representatives have full power to enter into this Agreement.  All written information provided to the Company about the Facility, or the Licensee, the principal owners of Licensee, any guarantor, or the finances or any such persons or entities, was or will be at the time delivered, true, accurate and complete, and such information contained no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances in which it is disclosed.

23.   **Relationship of Parties**.  Licensee is an independent contractor.  Neither party is the legal representative or agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever.  The Company and Licensee expressly acknowledge that the relationship intended by them is a business relationship based entirely on and circumscribed by the express provisions of this Agreement and that no partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

If the Licensee shall be any two or more persons and/or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits granted herein may only be exercised and enjoyed jointly; the liabilities and responsibilities hereunder assumed, however, shall be the joint and several obligations of such persons or entities.

21

Except as otherwise expressly stated in this Agreement, the parties recognize the Licensee exercises full and complete control over and has full responsibility for its labor relations and employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation and work rules and schedules of its employees.

Licensee acknowledges that the Company may, in its sole discretion, depending upon local market conditions or assessment of special circumstances, from time to time, (i) grant other licensees areas in which no other System hotel will be franchised, for periods of time determined by the Company; and (ii) permit deviations from the provisions of this Agreement including, without limitation, those provisions relating to Initial Fees and Recurring Fees, and that no such grants or deviations create any right in the Licensee to similar treatment.

24.    **Partial Invalidity**.  Should any part of this Agreement, for any reason, be declared invalid, such decision shall not affect the validity of any remaining portion; provided, however, that if in the sole judgment of the Company such declaration of invalidity shall substantially impair the value of this Agreement to the Company, then the Company may at any time thereafter terminate this Agreement by written notice to the Licensee and this Agreement shall thereupon terminate except as to those provisions relating to the taking of action or the abstaining from the taking of action by the Licensee after the termination thereof.

25.    **No Waiver**.  No failure or delay in requiring strict compliance with any obligation of this Agreement (or in the exercise of any right or remedy provided herein) and no custom or practice at variance with the requirements hereof shall constitute a waiver or modification of any such obligation, requirement, right or remedy or preclude exercise of any such right or remedy or the right to require strict compliance with any obligation set forth herein.  No waiver of any particular default or any right or remedy with respect to such default shall preclude, affect or impair enforcement of any right or remedy provided herein with respect to any subsequent default.  No approval or consent of the Company shall be effective unless in writing and signed by an authorized representative of the Company.  The Company's consent or approval may be withheld for so long as Licensee is in default of any of its obligations under this Agreement.

26.    **Notices**.  Notices will be effective hereunder when and only when they are reduced to writing and delivered, by next day delivery service, with proof of delivery, or mailed by certified or registered mail, return receipt requested, to the appropriate party at its address stated below or to such person and at such address as may be designated by notice hereunder.  Notices shall be deemed given on the date delivered or date of attempted delivery, if service is refused.

LICENSEE:                              THE COMPANY:

NORTH BECKLEY MOTEL CORP.              RAMADA FRANCHISE SYSTEMS, INC.
1 Dominion Center                      339 Jefferson Road, P.O. Box 278
#405-133 Waller Mill Road              Parsippany, New Jersey 07054-0278
Williamsburg, VA  23185

Attention:Robert Milam                 Attention: Vice President -
                                       Franchise Administration

27.  **Miscellaneous**. The remedies provided in this Agreement are not exclusive. This Agreement will be construed in accordance with the laws of the State of New York. Licensee consents to the non-exclusive personal jurisdiction of the New York state courts situated in New York County, New York and the United States District Court for the Southern District of New York. Licensee waives objection to venue in any such court. This Agreement is exclusively for the benefit of the parties hereto and may not give rise to liability to a third party. No agreement between the Company and anyone else is for the benefit of Licensee. Neither party will interfere with contractual relations of the other and exercise by the Company of any right or discretion provided the Company under this Agreement shall not constitute such interference. The section headings in this Agreement are for convenience of reference only and will not affect its interpretation.

28. **Special Stipulations**. Notwithstanding anything contained herein to the contrary, the following Special Stipulations shall be controlling over conflicting or inconsistent provisions of this Agreement and shall not be transferable or assignable to Licensee's successor in interest:

(a)  Initial Fee. An Initial Fee of **$19,000.00** shall be due and payable as follows: $9,000.00 shall be due upon execution by Licensee of this Agreement. **$10,000.00** shall be due and payable as evidenced by delivery of a Promissory Note attached hereto.

(b)  Special Royalty Notwithstanding Section 8 (a), Licensee will pay the Royalty to the Company on Gross Room Revenues accruing during the periods and at the rates set forth in this paragraph:

(i)   For the period commencing on the Opening Date through the day before the thirteenth (13th) month anniversary of the Opening Date, the Royalty shall be two percent (2%) of Gross Room Revenues; and

(ii)  For the period beginning on the thirteenth (13th) month anniversary of the Opening Date through the day before the twenty-fifth (25th) month anniversary of the Opening Date, the Royalty shall be three and one half percent (3.5%) of Gross Room Revenues; and

(iii) For the period beginning on the twenty-fifth (25th) month anniversary of the Opening Date through balance of the Term, the Royalty shall be at the rate specified in Section 8 (a).

The Royalty rate changes set forth in this paragraph shall automatically terminate without notice or opportunity to cure, and the Royalty shall reset to the rate specified in Section 8 (a), if and as of the date (i) The Company sends to Licensee a valid notice of termination under this Agreement, or the License automatically terminates, or the Company sends Licensee a notice of default and Licensee fails to cure the default within the time specified, if any, in the notice of default or, (ii) the Facility receives a quality assurance inspection score of less than 400 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 400 in a reinspection to be performed not less than 30 days after the initial inspection, after the Facility achieves the 400 quality assurance inspection score required under the Renovation Obligation.

(c)    Additional Licensee Termination Right   Licensee shall have the right to terminate the License without cause effective only on the fifth anniversary of the Opening Date provided it has first given the Company at least six (6) months prior written notice of termination and is not in default under this Agreement at the time notice must be given or at the effective date of termination. Licensee shall be liable to pay no Liquidated Damages if the License is terminated in accordance with the preceding sentence and Licensee performs the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Licensee's rights under this paragraph shall automatically terminate without notice if and as of the date (i) the Company sends to Licensee a notice of termination under this Agreement, or the License automatically terminates, or the Company sends Licensee a notice of default and Licensee fails to cure the default within the time permitted, if any, in the notice of default or, (ii) the Facility receives a quality assurance inspection score of less than 400 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 400 in a reinspection to be performed not less than 30 days after the initial inspection after the Facility achieves the 400 quality assurance inspection score required to satisfy the Renovation Obligation.

(d)    Additional Company Termination Right   The Company shall have the right to terminate the License without cause or penalty effective only on the fifth anniversary of the Opening Date provided it has first given Licensee at least six (6) months prior written notice of termination. Licensee shall perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. **The Company may not exercise window in the event Licensee maintains a 425 quality assurance inspection score.**

(e)    Transfer Rights   If Licensee is not then in default under this Agreement, the License may be transferred upon Licensee's written request, the transferee's submission of a completed application on the Company's then current form, the transferee's qualification under the Company's then current standards for new licensees, and payment of a $25,000.00 transfer fee. The Company may require the execution of its then current standard forms of license agreement (or a transfer and assumption agreement provided by the Company in its sole discretion), a new or supplemental guarantee agreement and related agreements by the transferee and its principals, payment of all Recurring Fees and other amounts due under this Agreement, payment of other amounts then owed by Licensee, the transferee, or their respective affiliates and principals to the Company and its affiliates, reasonable renovation and upgrading of the Facility to System Standards applicable to entering conversion Facilities at that time, and the execution of general releases by Licensee and each of its principals as conditions precedent to the transfer. Under no circumstances shall any such transfer have the effect of releasing Licensee from its

obligations hereunder or releasing the liability of any guarantor of Licensee's obligations, arising or accruing prior to, or in respect of events occurring prior to, the transfer.

(f) <u>Liquidated Damages Limit</u>   In no event shall the amount of Liquidated Damages payable upon termination of this Agreement exceed $1,000.00 per guest room.

(g) <u>Minor Renovation Ceiling Amount</u>   In no event shall the minor renovation ceiling amount exceed $1,500.00 per guest room.

**THIS PORTION OF THE PAGE INTENTIONALLY LEFT BLANK**

This Agreement, together with all instruments, exhibits, attachments and schedules hereto, constitutes the entire agreement (superseding all prior agreements and understandings, oral or written) of the parties hereto with respect to the Facility and shall not be modified or amended in any respect except in writing executed by all such parties.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

THE COMPANY:

RAMADA FRANCHISE SYSTEMS, INC.

ATTEST:_____    BY:_____
        Assistant Secretary              (Executive Vice) President

LICENSEE:

NORTH BECKLEY MOTEL CORP.

ATTEST:_____    _____
                                     President

## APPENDIX A

### Definitions

Agreement shall mean this License Agreement.

Application Fee shall have the meaning given such term in Section 7 of this Agreement.

Approved Construction Plans shall have the meaning given such term in Section 3 of this License Agreement.

Approved Supplier shall have the meaning given such term in Section 15 of this Agreement.

Approved Supplier List shall mean the list of Approved Suppliers maintained by the Company from time to time in accordance with Section 15 of this Agreement.

Casualty shall mean destruction or significant damage to the Facility by act of God or other event beyond Licensee's reasonable anticipation and control.

Conference Registration Fee shall mean the fee charged for attendance at the annual RINA conference.

Company shall mean Ramada Franchise Systems, Inc., its successors and assigns.

Condemnation shall mean if the Facility is condemned, or such a substantial portion of the Facility shall be condemned such that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion thereof is sold to the condemning authority or its designee in lieu of condemnation.

Confidential Information shall mean any System trade secrets and other proprietary information not generally known to the lodging industry, whether imparted to or learned by Licensee, its employees and/or its representatives prior to or during the Term including, but not limited to, the Systems Standards Manual, operating system and applications software for accessing the Reservation System, and related user manual and other documentation.

Design Standards shall mean standards specified in the System Standards Manual from time to time for designs for new, upgraded or modified facilities, including all aspects of facility design, minimum number of rooms, rooms mix and configuration, construction materials, landscaping, amenities, interior decor and the like for a System facility.

Effective Date shall mean the date of execution of this License Agreement by the Company and Licensee, or as specified in the preamble.

27

Equity Interests shall include, without limitation, all forms of voting stock interests, general partnership interests, limited partnership interests and all options, warrants, and instruments convertible into conventional equity interests.

Facility shall mean the parcel of land located at the Location, all common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, "FF&E" and other improvements now or hereafter existing at the Location.

FF&E shall mean, collectively, furniture, fixtures and equipment.

FF&E Standards shall mean standards specified in the System Standards Manual from time to time for furniture, fixtures, equipment and supplies to be utilized in a System facility.

Food and Beverage shall mean any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

FSH shall mean Franchise System Holdings, Inc.

Gross Room Revenues shall mean gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Indemnitees shall mean the Company, its direct and indirect parent, subsidiary and sister corporations, and their respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee shall have the meaning given such term in Section 7 of this Agreement.

License shall mean a non-exclusive license to operate the type of System facility indicated in Schedule B hereto only at the Location, using the System under the Mark designated by the Company.

Licensee shall mean the party so named in the first paragraph of this Agreement.

Liquidated Damages shall mean that amount payable pursuant to Section 20 of this Agreement as liquidated damages for termination of this Agreement, in lieu of actual damages and not as a penalty.

Location shall mean 1000 Highway 16, Mt. Hope, WV  25880, as more fully described in Schedule A attached hereto.

28

Losses and Expenses shall mean all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards shall mean the standards specified from time to time in the System Standards Manual for replacement of FF&E, decor, and other capital items and design materials in System facilities.

Marks shall mean, collectively the service mark, "Ramada®", plus other related service marks, trademarks, tradenames, logos and derivations (regardless of whether registered or existing at common law), trade dress, and associated business good will.

Marks Standards shall mean standards specified in the System Standards Manual from time to time for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Master License Agreements shall mean, collectively, the license agreement between the Company and FSH dated as of September 18, 1989, as amended and restated as of December 7, 1989 and as of July 15, 1991 and the license agreement dated November 1, 1991 between such parties.

Minor Renovation shall have the meaning given such term pursuant to Section 16(d) of this Agreement.

Minor Renovation Ceiling Amount shall mean $3,000.00 per guest room.

Minor Renovation Notice shall have the meaning given such term pursuant to Section 16(d) of this Agreement.

Opening Date shall mean the date on which the Company authorizes Licensee to open the Facility as part of the System.

Operations Standards shall mean standards specified from time to time in the System Standards Manual for cleanliness, maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee shall mean any natural person(s) receiving a portion or all of Licensee's Equity Interest or interest in this Agreement without consideration by will, trust or intestate succession (but not by gift or by divorce settlement or decree), provided that such Permitted Transferee(s) agrees, in writing, to be bound by this Agreement or, at the Company's option,

29

the License Agreement form then used for new licensees.

Punch List shall mean the list of upgrades and improvements required to be made to the Facility in order to satisfy the Renovation Obligation, which is attached to this Agreement as part of Schedule B.

Recurring Fees shall mean fees paid on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees and taxes payable under Section 8 of this Agreement.

Renovation Obligation shall mean, collectively, the Design Standards, the FF&E Standards, Schedule B, and the Approved Construction Plans, as modified from time to time with the Company's prior written approval, and shall specifically include, without limitation, the completion in a timely fashion of all items specified on the upgrading addendum attached to this Agreement as part of Schedule B, all work necessary to achieve a 400 or equivalent quality assurance inspection score in time for a timely opening of the Facility under the System and all work required to achieve a 425 or equivalent quality assurance inspection score no later than nine (9) months after the date the Facility opens under the System.

Reservation System shall have the meaning given such term in Section 10 of this Agreement.

RINA shall mean the Ramada Inter-National Association.

RINA Services Assessment Fees shall mean the assessments charged as set forth in Section 8(a)(ii) hereof.

Royalties shall have the meaning given such term in Section 8(a)(i) of this Agreement.

System shall mean the rights of the Company to the Marks; other intellectual property, including copyrights, trade secrets and know-how; advertising and other marketing programs; operating, quality assurance, training and consulting programs and procedures; System Standards; the Reservation System; and other services.

System Standards shall mean the standards for the System as set forth from time to time in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards relating to System operation and usage.

System Standards Manual shall mean the "Standards of Operation and Design" manual, and other manual published or disseminated by the Company from time to time specifying the System Standards.

Technology Standards shall mean standards specified from time to time in the System Standards Manual for telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front

30

desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the System facilities.

Term shall mean the period of time in which this Agreement shall be in effect, as set forth in Section 6 of this Agreement.

## SCHEDULE A

(Legal Description of Facility)

32

## SCHEDULE B

PART I:  DESCRIPTION OF FACILITY:

Type of Facility:  Ramada Inn

Number and type of approved guest rooms:  122

      0  Suites
    122  Standard Rooms

Restaurants and lounges (number, seating capacity, names and description): 190 seat restaurant, 34 seat lounge

Gift Shop:  None

Other concessions and shops:  Game Room

Parking facilities (number of spaces, description):  At least 122 Parking Spaces

Swimming pool:  Outdoor pool

Other facilities and services, such as Meeting and Banquet Rooms, Conference Center, etc.: 2 meeting rooms

Ownership of Licensee:

    Robert Milam            66 2/3 %
    1000 Highway 16
    Mt. Hope, WV  25880

    Harold Madison     33 1/3 %
    1000 Highway 16
    Mt. Hope, WV  25880

PART II:  DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED BY LICENSEE:

Improvements must be made to the Facility pursuant to the attached Punch List and to the extent necessary to achieve minimum quality assurance inspection test scores of 400 prior to commencing operation of the Facility under the System and 425 within nine (9) months after the Opening Date.  Licensee must commence renovation on or before 30 days after the date of this Agreement and pass a quality assurance inspection with a score of 400 or better and be ready, willing and able to open the Facility under the System on or before **180** days after the date of this Agreement to satisfy the Renovation Obligation.  The Facility shall not bear or display any System Marks during Licensee's performance of the Renovation Obligation.

The Punch List attached as Exhibit B has been prepared on the basis of a random sample inspection of the property on the date specified. The owner is responsible for improvements of areas not inspected to meet System Standards. All repairs, replacements and improvements must meet System Standards. Actual costs may vary materially from estimates. The Company does not warrant the accuracy of cost estimates. The Punch List will be subject to revision by the Company if the condition of the Facility changes materially or the Effective Date is more than 90 days after the date of the Punch List.

[Punch List to be Attached]

## SCHEDULE C
## TO
## <u>RAMADA LICENSE</u>

As provided in Section 8 of the Ramada License Agreement, Licensee will pay to RINA (not later than the 10th day of the following month) for each month (or part thereof) during the term of this License:

A RINA Services Assessment Fee of four and one-half percent (4.5%) of Gross Room Revenues, payable monthly for Advertising, Promotion, Training, Reservation and other related services and programs.

As resolved by the Ramada Inter-National (RINA) Executive Committee, commencing immediately, an additional sum equal to the RINA convention registration fee for one person will annually be assessed to each property.

REVISED SEPTEMBER 15, 1993
EXHIBIT B
RAMADA INN
PUNCHLIST SUMMARY
CROSSROADS BUDGET MOTEL
MT. HOPE, WEST VIRGINIA
JULY 20, 1993

Total Rooms:      122
Double/Double:    119
King:               3

## PROPERTY CONDITION SUMMARY:

This 10 year old property consists of an "L" shaped, two story, double loaded, interior corridor brick and wood building with a separate restaurant building.  Property appears to be in good structural condition but will require rather extensive exterior and guest room FF & E renovations.  Property will also require extensive public areas, restaurant and lounge renovations.

Lobby Dimensions:        24' X 24'
Guest Room Dimensions:   16' x 24'

## ITEMS MUST BE COMPLETED PRIOR TO ENTERING THE SYSTEM

**EXTERIOR:**                                    **ESTIMATED COST:**

1.  Provide Ramada Inn exterior signage.
    Signage must meet Company standards and
    be purchased through an approved vendor.
    **(NO RAMADA SYSTEM SIGNAGE MAY
    BE INSTALLED WITHOUT WRITTEN APPROVAL).**
    Property needs may vary, therefore, costs
    are not included in this estimate.
    De-identify existing property location.        _____

2.  Parking Lot:
    a.  Hotpatch, reseal, and restripe
        parking lot.
    b.  Replace wooden railroad tiles with
        cement car stops.
    c.  Paint security light poles and bases.      $ 4,000

3.  Landscaping:
    a.  Remove all unsightly plants, shrubs,
        and weeds.
    b.  Install new plants, shrubs, trees,
        and flowers.
    c.  Install grass seed to eliminate bare
        areas.                                       2,500

MT. HOPE, WV;    CROSSROADS BUDGET MOTEL
page 2

**EXTERIOR CONT:**
**NOTE:**    Recommend professional landscaping
            service.

4.  All exterior areas require extensive
    renovation and upgrading.  A comprehensive
    exterior renovation must be completed.  The
    Design and Construction Department for
    Ramada has provide renderings and
    recommendations and will become a part of
    this punchlist (plans and renderings are
    attached).                                          35,000

5.  Pressure wash sidewalks.  Cost not included.    _____

6.  Replace existing swimming pool fence.
    Pool fence must be electrostatically
    painted or anodized aluminum at a minimum
    height of 6'.  Chain link, wood, or vinyl
    fencing are not permitted.                          7,500

7.  Enclose dumpster area beside restaurant
    concealing dumpster and grease trap from
    guest view.                                         1,000

8.  Eliminate out of order kitchen equipment
    by side door to restaurant.                     _____

**PUBLIC AREAS:**

1.  Restaurant:
    a.  Replace carpet.
    b.  Paint walls, ceilings and trim.
    c.  Install decorative window treatment.
    d.  Eliminate/relocate/replace sofa
        under coat rack.
    e.  Refinish chairs and tables.
    f.  Recover booths to eliminate dated
        brown vinyl.  Fabric upholstery is
        recommended.  **(To be completed
        within 9 months of entering the
        system.)**
    g.  Eliminate broken, out of order,
        unused kitchen equipment.                      25,500

2.  Meeting Rooms:
    a.  Replace chairs with torn vinyl.
    b.  Replace carpet.                                  1,500

MT. HOPE, WV;    CROSSROADS BUDGET MOTEL
page 3

## PUBLIC AREAS CONT:

3. Restaurant bathrooms:
   a. Paint ceilings, trim, and vanity cabinets.
   b. Instal wall vinyl.                                          500

4. Lounge:
   a. Replace carpet.
   b. Replace wall vinyl where worn or torn.
   c. Replace window treatment.
   d. Paint ceilings, doors, and trim.
   e. Refinish/replace bar stools and chairs. Banquet chairs are not acceptable.        8,500

5. Lounge Restrooms:
   a. Replace sinks with vanity/sinks with minimum 8 inch skirting.
   b. Replace vanity mirrors.
   c. Professionally clean floors.
   d. Recaulk around toilet bowl.                                1,000

6. Renovate front desk/lobby area to include:
   a. Install vinyl wall covering throughout lobby area.
   b. Refinish front desk to eliminate dark wood finish; recommend a high pressure laminate (light color).
   c. Relocate key rack to drawer.
   d. Replace furniture. Ensure furniture package is contemporary in style and design; eliminate dark finished pieces i.e., coffee table.
   e. Install artwork and decorative treatment coordinates with renovation.            15,000

7. Corridors:
   a. Install wall vinyl covering throughout corridor area.
   b. Replace carpet where stained, matted, or worn (minimum 30 oz. required).
   c. Replace ceiling tiles that are stained or damaged; recommend "revealed edge" type; replace rusted tracking. RECOMMEND installing a solid white, textured finish (i.e., popcorn or similar) with recessed lighting and decorative fixtures.

MT. HOPE, WV;    CROSSROADS BUDGET MOTEL
page 4


PUBLIC AREAS CONT:
     d.   Paint doors, door frames, service doors,
         and stairwells.
     e.   Replace worn stairwell non-skids on
         steps.
     f.   Replace VCT floor tiles in stairways
         with ceramic tile.               29,000

8.  Restrooms:
     a.   Replace VCT floor tiles with ceramic
         tile or sheet vinyl.
     b.   Install wall vinyl.
     c.   Paint ceilings and trim.
     d.   Replace sinks with vanity/sink.
     e.   Replace mirrors.
     f.   Purchase and install bullet style
         waste baskets.                 1,600

9.  Install metal plate on ice machines to
    eliminate hole left by removal of coin
    slot.                       _____

10.  Game Room:  **To be completed within 9 months.**
     a.   Replace VCT floor tile with sheet
         vinyl.
     b.   Paint walls, ceilings and trim.      400

11.  Spa/Sauna:
     a.   Replace VCT floor tile with sheet
         vinyl.
     b.   Paint walls, ceilings, and trim.
     c.   Replace HVAC unit.
     d.   Replace carpet.  Recommend installing
         ceramic tile floors.
     e.   Replace ceramic floor tile in sauna.
     f.   Replace benches in sauna.
     g.   Replace wall, eliminating graffiti
         in sauna.  Cost not included.       _____


GUEST ROOMS & BATHS:

1.  Ramada Franchise Systems, will require
    an electronic/magnetic strip inn room
    entrance door lock set with deadbolt
    capabilities by January 1, 1996.  However,
    in the interim, current lock sets are
    acceptable.                    _____

MT. HOPE, WV;   CROSSROADS BUDGET MOTEL
page 5


GUEST ROOMS & BATHS CONT:
2.   Purchase a complete inventory of towels
     and terry stock to comply with company
     specifications.                                    6,100

3.   Replace linen to include sheets, pillows,
     pillow cases, blankets and mattress pads.
     NOTE:  Recommend 3.5 par.                          6,100

4.   Purchase and install room numbers.
     Recommend 2 x 4 inch plaque mounted
     five to six feet above floor level.
     Eliminate painted room numbers.                      600

5.   Renovate guest rooms to include the following:
     a.   Repair/replace ceilings, trim,
          connecting doors, bathroom doors,
          and door frames.
     b.   Install wall vinyl to include bathroom,
          minimum of 14 oz. required.
          Eliminate coated wall board.
     c.   Replace artwork.  Glass fronted, framed
          two pictures per room required.
     d.   Replace carpet and padding; minimum
          28 oz. cut pile, wall-to-wall type with
          50 oz. padding required.  Recommend 30
          oz. carpet.
     e.   Replace casegoods to include; headboards,
          credenzas, nightstands, desks, desk
          chairs, tables, occasional chairs, and
          credenza mirrors.
     f.   Replace swag lamps with floor lamp in
          leisure area.
     g.   Replace lamp shades on bedside lamps
          and credenza lamps.
     h.   Lower bedside, wall mounted lamps for
          guest conveyance.
     i.   Purchase and install framed, full
          length mirrors as required.  **To be
          completed within 9 months.**
     j.   Replace all televisions with remote
          control style per Company standards.
          **To be completed within 9 months.**
     k.   Purchase and install AM/FM radios as
          required.  **To be completed within 9
          months.**
     l.   Replace bedspreads; decorative quilted
          type required.
     m.   Replace drapes; decorative blackout
          type required.

MT. HOPE, WV;    CROSSROADS BUDGET MOTEL
page 6

GUEST ROOMS & BATHS CONT:
    n.   Replace bedsets in all rooms.
    o.   Purchase and install fire retardant
        UL approved waste baskets as required.
        **To be completed within 9 months.**
    p.   Install "wing wall" at closet area to
        conceal from guest's view.
    q.   Replace corroded clothes racks as in
        128 where needed (approx. 35 rooms).
    r.   Replace VCT bathroom floor tile with
        non-slip vinyl or ceramic tile in all
        rooms.
    s.   Professionally clean bath tubs shower
        walls and soap dishes to eliminate
        soap film build-up.
    t.   Purchase and instal non-skid strips
        or mats on tubs.  Eliminate flowers.
    u.   Install towel shelf with bar, eliminating
        stack racks.
    v.   Ensure 50% of rooms are non-smoking.      328,900

MISCELLANEOUS:

    Install reservation system equipment per
    company specifications.  Reservation
    equipment must be purchased.  Cost not
    included in this estimate.         ————

BRAND STANDARDS:

    Must comply with Brand Standards, including,
    but not limited to, employee uniform package,
    amenities, logo'd supplies and all
    signage/graphics.      5,500

                  **PROPERTY TOTAL:**    **$ 480,200**

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND WILL NOT BE CONSIDERED DURING FUTURE EVALUATIONS.  **ANY
AND ALL REVISIONS TO THIS PUNCHLIST MUST BE MADE AND APPROVED BY
THE QUALITY ASSURANCE DEPARTMENT.**

MT. HOPE, WV;    CROSSROADS BUDGET MOTEL
page 7

This punchlist has been prepared on the basis of a random sample inspection of the property on the date specified.  The owner is responsible for improvement of areas not inspected and to meet all Ramada System Standards.    All repairs, replacements, and improvements must meet standards published in the Ramada Standards of Operations and Design Manual.  Actual costs may vary materially from estimates.   Ramada does not warrant the accuracy of cost estimates.

The punchlist will be subject to revision by Ramada if the condition of the property changes materially, or the License Agreement to which this is attached, is executed more than 90 days after date of punchlist.  Also, if the property does not enter the system within 180 days after the punchlist date, the punchlist may be invalidated or revised at the discretion of the Quality Assurance Department; this punchlist becomes subject to revision six months from the above date.

**PUNCHLIST WAS REVISED SEPTEMBER 15, 1993;   ALL OTHER COPIES ARE INVALID.**

Prepared by: Lori DeLoach

Reviewed by: _____    Date: __9/15/93__

**WVMTHOPE.RI**

# EXHIBIT B

## GUARANTY

As an inducement to RAMADA FRANCHISE SYSTEMS, INC. (the"Company") to execute the foregoing License Agreement, the undersigned, jointly and severally, hereby irrevocably and unconditionally (i) warrant to the Company and its successors and assigns that all of Licensee's representations and warranties in the License Agreement are true and correct as stated, and (ii) guaranty that all of Licensee's obligations under the License Agreement, including any amendments thereto whenever made (the "Agreement"), will be punctually paid and performed.

Upon default by Licensee or notice from the Company, the undersigned will immediately make each payment and perform or cause Licensee to perform, each obligation required of Licensee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, the Company may without notice to the undersigned extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. The undersigned waive notice of amendment of the Agreement and the giving of notice or demand by the Company for payment or performance by Licensee.

Upon the death of an individual guarantor, the estate of such guarantor will be bound by this guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of the date of the above Agreement.

Witnesses:

Guarantors:

ROBERT MILAM

_____ (Seal)

HAROLD MADISON

_____ (Seal)

37

**EXHIBIT C**



July 25, 2005                                                                                    **Franchise Administration**
                                                                                                **VIA OVERNIGHT COURIER**

Ms. Laura Martin *TKLG# 1 2 22445 x c* *94849743*
North Beckley Motel Corp.
127 Ontario Drive
Mt. Hope, WV 25880

Re:     **ACKNOWLEDGEMENT OF TERMINATION** of the License for Ramada® System Unit #2681-
14641-1 located at Beckley/Mt. Hope, WV (the "Facility")

Dear Ms. Martin:

Ramada Worldwide Inc., formerly known as Ramada Franchise Systems, Inc. ("we" or "us") has received a letter
dated May 19, 2005 advising us that North Beckley Motel Corp. ("you" or "your") stopped operating the Facility
as a Ramada facility. Accordingly, we acknowledge that the License Agreement, dated February 18, 1994 (the
"Agreement"), has terminated effective May 31, 2005 (the "Termination Date").

The Agreement requires you to perform certain post termination obligations. In addition to other obligations
specified in the Agreement, by no later than fourteen days after the Termination Date, you must (a) remove all
signage and other items bearing the Ramada Marks; (b) perform all post-termination obligations specified in the
Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides,
hotel indexes and similar materials in which the Facility is identified as a Ramada; and (d) remove the Ramada
Marks from any advertising or promotional activities on, around or directed towards the Facility, including any
web sites, web pages or search engines. You must cooperate fully with us regarding any post-termination
inspections by us to verify that the Facility has been properly de-identified. You must immediately return to us all
training documents, operating manuals and other proprietary material.

Because you terminated the Agreement prematurely, you must pay us Liquidated Damages of $122,000.00, as
specified in Section 28(f) of the Agreement. You must also pay any outstanding Recurring Fees and any other fees
and charges through the date you complete the de-identification of the Facility. We estimate that, as of July 14,
2005, you owe us $40,467.72 in such fees and charges. Please pay us this amount within fourteen days. Please
consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of
your guarantors.

If you have any questions, please contact Randi Siouffi, Manager of Settlements, at (866) 582-9104, option 6.

Sincerely,

Kathy Cox
Senior Director
Franchise Administration

Enclosure

cc:     Robert Milam (Guarantor)
        Harold Madison (Guarantor)                           Randi Siouffi
                                                             Keith Pierce

*Ramada Worldwide, Inc.   1 Sylvan Way   Parsippany, New Jersey 07054   Telephone 1-866-582-9104   Facsimile (973) 496-5345*

```
ITEMIZED STATEMENT                                      PAGE 1
FOR RAMADA #2681-14641 - Beckley/Mt. Hope, WV
AS OF 2005-07-14


        RELATION      ITEM                              AMOUNT
MONTH   NBR           DATE        DESC                     DUE
-----   ------------  ----------  --------------------  ------------------  ----
    1   26810501A-01  2005-01-31  ROYALTY ACCRUAL          2,200.00         ACR
        26810501A-10  2005-01-31  RINA FEE ACCRUAL         2,500.00         ACR
        IN1456394-01  2005-01-31  JAN-HSS SOFTWARE MAI       101.68
        IN1456394-02  2005-01-31  DEC-HSS SOFTWARE MAI       101.68
        IN1456394-02  2005-01-24  DEC-HSS SOFTWARE MAI        -5.69
                                                        ------------------
                                                         4,897.67


    2   IN1461350-02  2005-02-23  FEB-PPU INTER-NET CH        19.95
        IN1461350-03  2005-02-23  TRIPREWARDS 5%CHRGBK        76.44
        TA3026218-01  2005-02-25  T/A COMMISSIONS             18.38
        TA3026218-01  2005-02-25  T/A COMMISSIONS              1.40
        TP4026218-01  2005-02-25  GDS & INTERNET BKGS         16.00
        26810502A-01  2005-02-28  ROYALTY ACCRUAL          2,400.00         ACR
        26810502A-01  2005-03-30  ROYALTY ACCRUAL          2,400.00         ACR
        26810502A-01  2005-03-25  ROYALTY ACCRUAL         -2,400.00         ACR
        26810502A-10  2005-02-28  RINA FEE ACCRUAL         2,700.00         ACR
        26810502A-10  2005-03-30  RINA FEE ACCRUAL         2,700.00         ACR
        26810502A-10  2005-03-25  RINA FEE ACCRUAL        -2,700.00         ACR
        IN1467216-01  2005-02-28  FEB-HSS SOFTWARE MAI       101.68
                                                        ------------------
                                                         5,333.85


    3   IN1472255-01  2005-03-09  G/S Nancy Vogt              49.05
        IN1472255-02  2005-03-09  TRANS CHG Nancy Vogt        75.00
        IN1472255-03  2005-03-09  2ND RMA 2005 PYMT          915.00
        IN1476930-02  2005-03-23  MAR-PPU INTER-NET CH        19.95
        IN1476930-03  2005-03-23  2005 RINA CONF REG         895.00
        IN1483463-01  2005-03-30  TRIPREWARDS 5%CHRGBK       244.86
        IN1483463-02  2005-03-30  MAR-HSS SOFTWARE MAI       101.68
        26810503A-01  2005-03-31  ROYALTY ACCRUAL          2,300.00         ACR
        26810503A-10  2005-03-31  RINA FEE ACCRUAL         2,500.00         ACR
        TA3032366-01  2005-03-31  T/A COMMISSIONS            124.80
        TA3032366-01  2005-03-31  T/A COMMISSIONS              3.85
        TP4032366-01  2005-03-31  GDS & INTERNET BKGS         63.50
                                                        ------------------
                                                         7,292.69


    4   IN1490514-01  2005-04-13  NT AUDIT VAR ROYALTY       358.04
        IN1490514-02  2005-04-13  NT AUDIT VAR RINA          402.80
        IN1492229-02  2005-04-20  APR-PPU INTER-NET CH        19.95
        IN1497566-01  2005-04-27  TRIPREWARDS 5%CHRGBK       340.94
        IN1497566-02  2005-04-27  APR-HSS SOFTWARE MAI       101.68
        TA3038412-01  2005-04-28  T/A COMMISSIONS             29.01
        TP4038412-01  2005-04-28  GDS & INTERNET BKGS          9.00
        26810504A-01  2005-04-30  ROYALTY ACCRUAL          2,900.00         ACR
        26810504A-10  2005-04-30  RINA FEE ACCRUAL         3,200.00         ACR
        FC0313363-01  2005-04-30  FINANCE CHARGE               8.89
        IN1501655-01  2005-04-30  G/S Rhea Hayes              59.95
        IN1501655-02  2005-04-30  TRANS CHG Rhea Hayes        75.00
```

```
ITEMIZED STATEMENT                                        PAGE 2
FOR RAMADA #2681-14641 - Beckley/Mt. Hope, WV
AS OF 2005-07-14
```

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|-----------:|---|
| 4 | IN1501655-03 | 2005-04-30 | G/S Sandy Liner | 25.00 | |
| | IN1501655-04 | 2005-04-30 | TRANS CHG Sandy Line | 75.00 | |
| | | | | 7,605.26 | |
| 5 | IN1510763-01 | 2005-05-25 | G/S Robert Lindsay | 35.00 | |
| | IN1510763-02 | 2005-05-25 | TRANS CHG Robert Lin | 75.00 | |
| | IN1510763-03 | 2005-05-25 | MAY-PPU INTER-NET CH | 19.95 | |
| | IN1510763-04 | 2005-05-25 | TRIPREWARDS 5%CHRGBK | 2.00 | |
| | IN1510763-05 | 2005-05-25 | MAY-HSS SOFTWARE MAI | 101.68 | |
| | 26810505A-01 | 2005-05-31 | ROYALTY ACCRUAL | 3,000.00 | ACR |
| | 26810505A-10 | 2005-05-31 | RINA FEE ACCRUAL | 3,400.00 | ACR |
| | FC0316975-01 | 2005-05-31 | FINANCE CHARGE | 30.65 | |
| | TA3044474-01 | 2005-05-31 | T/A COMMISSIONS | 5.50 | |
| | | | | 6,669.78 | |
| 6 | IN1520110-01 | 2005-06-15 | PROCS CHG Lee Anarin | 25.00 | |
| | IN1523812-01 | 2005-06-22 | G/S Charlene Eckstei | 70.00 | |
| | IN1523812-02 | 2005-06-22 | TRANS CHG Charlene E | 75.00 | |
| | IN1523812-03 | 2005-06-22 | JUN-PPU INTER-NET CH | 19.95 | |
| | IN1529802-01 | 2005-06-29 | PROCS CHG Ron Powell | 25.00 | |
| | IN1529802-02 | 2005-06-29 | JUN-HSS SOFTWARE MAI | 101.68 | |
| | 26810506A-01 | 2005-06-30 | ROYALTY ACCRUAL | 3,900.00 | ACR |
| | 26810506A-10 | 2005-06-30 | RINA FEE ACCRUAL | 4,400.00 | ACR |
| | FC0320596-01 | 2005-06-30 | FINANCE CHARGE | 51.84 | |
| | | | | 8,668.47 | |
| | | | | ================= | |
| | | | | 40,467.72 | |